UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRISTOBAL ZAMUDIO,<br><br>        Plaintiff,<br><br>  v.<br><br>CITY OF OAKLAND,<br><br>        Defendant.<br>_____/ | No. C 07-05713 MHP<br><br>**MEMORANDUM & ORDER**<br><br>**Re: Defendant's Motion for Summary Judgment** |

      Plaintiff Cristobal Zamudio ("plaintiff") brings this action against his employer, the City of Oakland ("defendant" or "City"), pursuant to Title VII and the California Fair Housing and Employment Act (FHEA). Now before the court is defendant's motion for summary judgment or, in the alternative, summary adjudication. Having considered the parties' arguments and submissions, the court enters the following memorandum and order.

BACKGROUND[1]

I.    Parties

      As of 2001, plaintiff was employed by defendant as a Gardener III, Crew Leader, ("Gardener Crew Leader") through defendant's Public Works Agency, Parks and Buildings Division. Plaintiff performed grounds maintenance at parks and landscaped areas within Oakland. Plaintiff is of Mexican origin and is, as of today, about fifty years old. Defendant is a political subdivision of the State of California that was in the past, and is currently, plaintiff's employer.

II.     Events from 2001 through May 31, 2005

Following plaintiff's 2001 promotion to Gardener III, Crew Leader, plaintiff suffered on-the-job injuries to his left knee, both elbows and back. He underwent a succession of surgeries and rehabilitation which rendered him unable to work from October 2002 to early January 2005. Plaintiff filed workers compensation claims for these injuries. Plaintiff's physicians, Dr. Moses Taghioff and Dr. Ashay Kale, released plaintiff to return to work as of January 4, 2005, with a fifty pound lifting restriction for his back and no restriction on the use of his knees. At that time, Dr. Taghioff treated plaintiff's back problems, while Dr. Kale treated plaintiff's knee problems. Plaintiff was cleared to return to work that day after a physician from Concentra Medical Center, Dr. Hong Zhang, concurred with the release to work with the fifty pound lifting restriction. Concentra was an outside private medical services group that provided medical evaluation services for defendant.

When plaintiff returned to work as a Gardener Crew Leader on January 4, 2005, he participated in defendant's Transitional Duty Program (TDP). When an employee is injured on the job and his physician imposes work restrictions, the employee in the TDP program may be given a transitional work assignment, a type of modified duty with full salary and benefits, for ninety days. Holmes Dec. ¶ 5. At the end of the modified duty period, the employee must either receive medical clearance or apply for a reasonable accommodation in order to return to work. Id. ¶ 10. The TDP is designed to deal with temporary injuries by allowing an injured employee to remain financially secure while easing back into the performance of the full range of duties required by his or her usual position.

When plaintiff returned to work in January 2005, he did not request that defendant make any accommodation to do his job as Gardener Crew Leader. During plaintiff's period in the TDP, the number of sections he had to work dropped from thirteen to six, and he was not required to mow grass, which would have entailed lifting a brush mower weighing approximately one hundred pounds. In the period from January through March 2005, plaintiff's physicians reported on three different occasions that plaintiff was experiencing significant pain in his back and in other parts of

2

his body. Valerio Dec., Exhs. II, JJ & KK. The normal ninety-day modified duty period expired for plaintiff on April 4, 2005, but it was extended in view of a scheduled May 13 appointment with Dr. Taghioff to provide an update of the status of plaintiff's back injury. Holmes Dec. ¶ 7.

Following the May 13, 2005, appointment with plaintiff, Dr. Taghioff advised defendant that plaintiff continued to require the fifty pound lifting restriction for his back. On or about May 27, 2005, defendant informed plaintiff by letter that plaintiff's participation in the TDP would end on May 31, 2005, because his medical condition had not improved. The letter was sent by the Public Works Agency's workers compensation coordinator, Barbara Holmes. Holmes Depo., Exh. A. It is not clear that Holmes knew at the time she sent the letter whether plaintiff's job required him to be able to lift fifty pounds. Holmes Depo. at 34.[2] The letter instructed plaintiff not to report to work as of May 31. Zamudo Dec. ¶ 60. It also advised plaintiff to contact the City's Equal Opportunity Programs Department ("EOPD") if he felt his work injury constituted a disability requiring accommodation under the Americans with Disabilities Act or the California Fair Employment and Housing Act.

III.     Events from June 1, 2005, through October 31, 2005

On June 15, 2005, an outside consultant was engaged to do an Essential Job Function Analysis ("EJFA") for the Gardener III, Crew Leader, position. Holmes Dec. ¶ 12. On June 17, 2005, EOPD provided plaintiff with an authorization form to allow the City to obtain plaintiff's medical information; plaintiff returned the signed authorization form several weeks later, on July 11, 2005. In the meantime, Taghioff wrote on June 23, "although the pain has come back . . . I feel that Mr. Zamudo should not be restricted from his duties as mentioned above." Zamudio Depo., Exh. 2. Once the authorization was received, EOPD specialist Dwight Sterling reviewed plaintiff's file, on July 18, 2005. On July 20, defendant received a report from Taghioff releasing plaintiff to return to work with a fifty pound lifting restriction. On that same day, Sterling spoke with plaintiff over the telephone regarding plaintiff's work restrictions and job functions. On July 25, Sterling spoke with Holmes and learned that the City was waiting for the EJFA.

3

The City received the EJFA on August 22, 2005. Holmes Dec. ¶ 13. It identified the following heavy lifting requirements for the Gardener III, Crew Leader, position: retrieve and load illegally dumped items such as furniture, appliances, etc.; use of a fifty-five pound edger; use of a 100+ pound lawnmower; and picking up fifty pound sacks of fertilizer. On that same day, August 22, Sterling contacted plaintiff's supervisor, James P. Ryugo. Ryugo Dec. ¶¶ 1-2. Ryugo advised Sterling that he thought plaintiff's lifting restriction would prevent him from doing various job functions such as lifting heavy equipment and litter like couches, televisions and refrigerators that are dumped in the City's parks. Id. ¶ 3. Ryugo also stated that the Public Works Agency did not want to put plaintiff at risk of further injury and that because the department in which plaintiff worked was short-staffed, gardeners often had to work alone without help. On August 22, Sterling also called plaintiff and left a voicemail asking him to call; plaintiff returned the call over a month later, on September 26.

On September 29, 2005, Sterling, Ryugo, Holmes, Deputy City Administrator Cheryl Thompson and Public Works personnel manager Yolanda Lopez met to discuss plaintiff's medical condition and his ability to return to work. At this meeting, the City decided to send plaintiff to a Concentra physician who could both examine him and review the EJFA, to determine if plaintiff could return to work as a Gardener Crew Leader. Concentra physician Dr. Zhang saw plaintiff on October 19, 2005. After examining plaintiff and reviewing the EJFA, Zhang released plaintiff to return to work, with a fifty-pound lifting restriction. Plaintiff was told he could return to work on October 26, 2005. On October 31, 2005, he returned to full duty as a Gardener Crew Leader, with a fifty pound lifting restriction. From June 1, 2005, through October 31, 2005, there were no vacant positions with the City for which plaintiff was qualified, other than the Gardener Crew Leader position.

IV.     Events from November 1, 2005, through the Present

On January 31 and again on February 3, 2006, about three months after plaintiff had returned to his job as Gardener Crew Leader, plaintiff reported to Ryugo that he had run out of his

4

prescription medication and was experiencing severe pain. Ryugo advised plaintiff to consult Concentra's physician. On February 3, the physician, Dr. Zhang, gave plaintiff new restrictions: no repetitive lifting over fifty pounds; no pushing or pulling over fifty pounds; and no bending greater than four times per hour. On March 1, 2006, Dr. Victoria Barber, a Qualified Medical Examiner, evaluated plaintiff and also recommended additional restrictions, including: no heavy lifting, no bending or stooping, and no prolonged sitting. At that time, the job of Gardener Crew Leader required bending "constantly," and plaintiff could not perform the central functions of the job with bending restrictions unless he had a helper.

Plaintiff's new treating physician, Dr. Fulton Chen, examined plaintiff on April 26, May 17 and June 1, 2006, and concluded that plaintiff was temporarily totally disabled; the May 17 report concluded that plaintiff was unlikely ever to be able to return to heavy work. On June 20, Chen cleared plaintiff for modified duty, with the following restrictions: no lifting more than ten pounds; no repetitive bending or stooping; and no sitting, walking or standing for more than fifteen minutes at a time. The City subsequently determined that plaintiff could not return to his Gardener Crew Leader position with these restrictions and began looking for a temporary assignment for him.

On June 26, 2006, six days after being cleared for modified duty, plaintiff was assigned to the City's fuel station, where his primary responsibility was to watch the gas pumps to ensure no unauthorized person fueled his or her vehicle. Plaintiff was not required to pump gasoline or do any heavy lifting, and was free to sit, stand or walk around the perimeter of the fuel station. He received the same pay as he had received while working as a Gardener Crew Leader.

On July 18, 2006, plaintiff told his supervisor he was in too much pain to work. The following day, he saw Dr. Chen, who reported that plaintiff was having trouble working modified duty due to considerable pain. Chen placed plaintiff back on temporary total disability until August 1, 2006. On that date, Chen raised plaintiff's lifting restriction from ten to forty pounds, but he left the bending restrictions in place. On August 2, Barber again examined plaintiff, giving him several permanent work restrictions, including a restriction on repetitive bending and stooping.

5

On August 2, 2006, following the examination, plaintiff met with Sterling, who referred him to Debbie Corso at the Public Works Agency's personnel department. She met with plaintiff on August 23 to discuss possible job opportunities. The City's Office of Personnel Resource Management ("OPRM"), which performs city-wide job searches, sent a letter to plaintiff on August 28, informing him that it had been notified he could not longer perform the essential functions of Gardener Crew Leader. On August 30, OPRM reviewed the job specifications for a street maintenance worker position with the City as a potentially suitable assignment for plaintiff. For his part, plaintiff expressed interest, during a September 14 meeting with Sterling, in a traffic painter position he heard might be open in the street maintenance department. On September 26, 2006, Holmes and Lopez received a letter from a workers compensation claims specialist on contract with the City noting the possibility that plaintiff might require surgical intervention, including total knee replacement, in the future. Holmes Depo., Exh. 2F. On September 28, Sterling requested and received the EJFA for the traffic painter position. He and D. Jacquelyn Edwards, a principal human resources analyst for the City, went into the field to observe traffic painters at work on October 2. Sterling concluded that plaintiff could not perform the essential functions of that job due to his lifting and bending restrictions. Sterling advised plaintiff of his conclusion that plaintiff's work restrictions rendered him unable to perform the traffic painter job on October 9, 2006. For approximately ten months, the City sent plaintiff listings of the City's open positions as new positions opened. Zamudio Depo. at 208; Edwards Dec. ¶ 6.

On or about January 14, 2007, the City received reports from Dr. Chen dated January 4 and January 12, 2007, which cleared plaintiff to return to work, as to the back injury only, with a fifty pound lifting restriction. On March 2, Chen reviewed Dr. Barber's restrictions from August 2006, including the restriction on bending and stooping, and left them in place. On May 9, 2007, the City advised plaintiff that it would no longer send him job announcements but that he should continue to look for open jobs on the City's website or call the City's job hotline to keep abreast of current openings. The City did not offer to allow plaintiff to resume work as a Gardener Crew Leader.

6

On January 14, 2008, plaintiff signed a certification to the California Employment Development Division stating: "I certify that I continue to be disabled and incapable of doing my regular work . . . ." Lee Dec., Exh. G. On May 7, 2008, Chen reported that plaintiff could return to modified work on that day, with restrictions limiting his maximum standing in one spot to forty-five minutes with a five minute break in between, and his maximum walking to two hours at a time with a five minute break in between. In May, plaintiff also underwent foot surgery for an injury unrelated to this case. The City scheduled a fitness-for-duty evaluation for plaintiff on May 29, 2008. Dr. Joel Renbaum reported that plaintiff continued to be at "some risk for reinjury given his underlying back, elbow and bilateral knee conditions," but that Renbaum had no objection to plaintiff's returning to full duty with a thirty pound lifting restriction and no repetitive or prolonged kneeling, squatting or climbing. Plaintiff reported to work as a Gardener Crew Leader on July 16, 2008, after his foot healed. He continues to work in that position today. As of May 1, 2009, plaintiff is restricted from lifting more than fifty pounds and is restricted from walking more than two hours without a five minute break.

V.      Relevant Procedural History

Plaintiff filed discrimination complaints against defendant with the California Department of Fair Employment and Housing (DFEH) on November 25, 2005, and with the federal Equal Employment Opportunity Commission (EEOC) on December 20, 2005. He filed a second round of discrimination complaints with these agencies on May 2, 2007. He has received right-to-sue letters regarding all claims. Plaintiff also filed various workers compensation claims, beginning in 2002.

Plaintiff filed a complaint in the Superior Court for the State of California, County of Alameda, alleging violations of state law, on December 15, 2006. He filed a second complaint in state court, alleging violations of state and federal law, on August 13, 2007. The consolidated case was removed to this court on November 9, 2007. Following unsuccessful mediation, defendant moved for summary judgment on April 13, 2009, and oral argument was heard on May 18, 2009.

7

LEGAL STANDARD

Summary judgment may be granted only when, drawing all inferences and resolving all doubts in favor of the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see generally Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-255 (1986). A material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson at 248. The moving party bears the burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party meets its initial burden, the non-moving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is a genuine issue for trial. Fed R. Civ. P. 56(e); see Anderson at 250.

DISCUSSION

The operative complaints allege the following causes of action: failure to reasonably accommodate plaintiff's disability; discrimination on the basis of medical condition or disability, or on the basis of race or national origin; retaliation; harassment; failure to take corrective action or to take steps necessary to prevent the above; and actual and constructive termination of plaintiff's job. These purported causes of action are brought variously under Title VII of the Civil Rights Acts and the California Fair Housing and Employment Act, Cal. Gov't Code §§ 12920, 12921 & 12940 *et seq*.

I.  Failure to Reasonably Accommodate

Plaintiff argues that he was disabled because he was impaired in a major life activity (lifting) and that defendant failed to reasonably accommodate his disability during two periods: June 1, 2005, through October 31, 2005 ("the 2005 Period") and July 19, 2006, through July 16, 2008 ("the 2006-2008 Period"). To establish a prima facie case for failure to reasonably accommodate a disability under California Government Code § 12940(m), the plaintiff must show that he had a disability and that the employer did not make reasonable accommodation for his known disability. Bagatti v.

8

Dept. of Rehab., 97 Cal. App. 4th 344, 356 (2002). An employer is entitled to judgment as a matter of law on a failure to reasonably accommodate claim if it establishes that "(1) reasonable accommodation was offered and refused; (2) there simply was no vacant position within the employer's organization for which the disabled employee was qualified and which the disabled employee was capable of performing with or without accommodation; or (3) the employer did everything in its power to find a reasonable accommodation, but the informal interactive process broke down because the employee failed to engage in discussions in good faith." King v. United Parcel Serv., Inc., 152 Cal. App. 4th 426, 442-443 (2007) (citation omitted).

In this case, the record reveals extensive and continuing activity on the part of defendant to identify and make available a position with duties plaintiff was capable of performing. Moreover, defendant held open plaintiff's job—a job which he holds today—for approximately six years during his recovery from the on-the-job accident that precipitated his back, knee and elbow problems. Defendant also provided approximately five months of modified work for defendant in early 2005.

Plaintiff has stipulated that from June 1, 2005, through October 31, 2005, there were no vacant positions with the City for which plaintiff was qualified, other than the Gardener Crew Leader position. There is no evidence in the record that plaintiff proposed any particular accommodation during the 2005 Period other than simply to return to his prior job. Plaintiff questions defendant's decision not to reinstate plaintiff in the Gardener Crew Leader position during the 2005 Period, pointing out that he had the same fifty pound lifting restriction on October 31, 2005, as he had in May 2005. Yet plaintiff does not materially dispute that he was unable to meet the requirements of his job at that time. Indeed, once plaintiff was allowed to resume his job on October 31, 2005, he was able to work only three months before his condition was so exacerbated that new restrictions were imposed. When plaintiff was unable to perform the Gardener Crew Leader duties after February 2006, defendant accommodated him by providing him with a job at the fuel station, where plaintiff had virtually no physical demands placed upon him, as soon as plaintiff was cleared for such duty.[3] Plaintiff was unable to work even in that position for more than a few weeks before he had to be placed on temporary total disability. There is simply no evidence that

9

defendant's decision not to allow plaintiff to work as a Gardener Crew Leader during the 2005 Period was wrong, much less unreasonable.  Rather, all of the evidence points to the conclusion that plaintiff was unqualified for the Gardener Crew Leader job by virtue of his injuries, and plaintiff admits he was unqualified for the other vacant positions the City had during that time period.  The City was not required to create a new position or "bump" another employee in plaintiff's favor.  See McCullah v. So. Cal. Gas Co., 82 Cal. App. 4th 495, 501 (2000); Watkins v. Ameripride Serv., 375 F.3d 821, 828 (9th Cir. 2004).  The record shows that plaintiff was unqualified for any positions in the City, with or without accommodation, during the 2005 Period.

        The record also shows that in the 2006-2008 Period defendant took significant steps to accommodate plaintiff and assist him in finding another position.  Plaintiff complains that he was not hired as a traffic painter, but he has presented nothing to rebut defendant's evidence that plaintiff was incapable of meeting the job's requirements.  Plaintiff also complains that defendant refused to allow him to return to work as a Gardener Crew Leader in January 2007, despite Dr. Chen's report stating that plaintiff could return to work.  Plaintiff ignores the stipulated fact that Chen commented only on plaintiff's back while reserving judgment on the other parts of plaintiff's body.  The bending and stooping restriction and other restrictions remained on plaintiff until May 2008.  Plaintiff himself admits that he "constantly" bent down in his job.  Yet plaintiff does not even address the bending and stooping limitation in his opposition, despite defendant's stress on its importance in its motion paper.  As soon as the restriction on bending down was lifted, plaintiff was allowed to resume his job as a Gardener Crew Leader.  In short, the evidence shows the defendant did everything in its power to keep plaintiff employed with the City—short of placing him in a job for which he was manifestly unfit or which was likely to further endanger his health.

## II.     Discrimination

        Plaintiff asserts that he was discriminated against, but even now cannot say whether the discrimination was based on disability, race/national origin or (as he alludes to in his declaration) age.[4]  On summary judgment, discrimination claims are analyzed in three stages.  First, the plaintiff

10

has the burden of establishing a prima facie case of discrimination. Second, if the plaintiff meets this burden, the employer must offer a legitimate non-discriminatory reason for the adverse employment decision. Third, the plaintiff bears the burden of proving the employer's proffered reason was pretextual. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-803 (1973); Caldwell v. Paramount Unified Sch. Dist., 41 Cal. App. 4th 189, 196-197 (1995).[5] A "plaintiff's subjective beliefs in an employment discrimination case do not create a genuine issue of fact; nor do uncorroborated and self-serving declarations." King, 152 Cal. App. 4th at 433.

Plaintiff does not make out a prima facie case of discrimination. He offers nothing but his own self-serving generalizations. According to plaintiff, "Holmes is a real hard person with the Latinos." Zamudio Depo. at 91. Without some corroboration, plaintiff's vague assertion constitutes mere innuendo and does not support a discrimination claim. The only other evidence offered by plaintiff is the September 26, 2006, email received by Holmes and Lopez from the outside workers compensation claims specialist noting that plaintiff might require surgeries in the future. That these city employees may have been considering such issues does not support a claim of discrimination based on race or disability; rather, it can only reasonably support an inference that they were moving cautiously in returning an employee to a position that might further endanger his health. Nor is there any evidence to suggest any causal link between the claims specialist's remarks and any subsequent treatment of plaintiff by defendant. There is no evidence supporting a discrimination claim.

III.     Retaliation

Plaintiff also contends that he was retaliated against for filing workers compensation claims and discrimination claims. To establish a prima facie case of retaliation, a plaintiff must show he engaged in protected activity, that he was thereafter subjected to an adverse employment action by his employer and that there was a causal link between the two. Morgan v. Regents of Univ. of Cal., 88 Cal. App. 4th 52, 69 (2000) (citations omitted). Plaintiff has shown nothing suggesting a causal link between his earlier complaints and the refusal of defendant to reinstate him in his Gardener Crew Leader position from January 2007 to May 2008. By his own admission, plaintiff had to bend

11

"constantly" as a Gardener Crew Leader. The record is plain that plaintiff was restricted in his bending and stooping until May 2008. As soon as the bending limitation was lifted and plaintiff recovered from his unrelated foot surgery, plaintiff was allowed to resume his job, where he works today. There is insufficient evidence to infer other than that defendant had a legitimate, non-discriminatory reason for refusing to reinstate plaintiff as a Gardener Crew Leader.

IV.     Remaining Claims

In its moving papers, defendant made cogent and forceful arguments supporting summary judgment on plaintiff's remaining claims. Plaintiff did not choose to respond to those arguments and so concedes them.

CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is GRANTED in its entirety. Defendant's objections to plaintiff's declaration are DENIED as moot. Defendant's other pending motion, an administrative motion allowing late service of a witness list, is GRANTED. Judgment shall be entered accordingly.

IT IS SO ORDERED.

Dated: May 22, 2009

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

**ENDNOTES**

1.      Except where otherwise indicated, the facts are drawn from the Joint Statement of Undisputed Facts, Docket No. 45.  On a motion for summary judgment, the court may not make credibility determinations, must accept the non-moving party's evidence as true, and must draw all reasonable inferences in favor of the non-moving party.

2.      The redacted copy of Holmes's deposition filed by plaintiff did not include pages 33 or 35.  Without context or any other evidence, it is impossible to discern the significance of Holmes's statement on page 34 that she did not know whether plaintiff's job required him to lift over fifty pounds.

3.      In his opposition, plaintiff objects to defendant's conclusion that plaintiff was unable to work as a Gardener Crew Leader on the basis that plaintiff was able to carry out the functions of his job with the "helper" he had at the time.  Defendant has provided unrebutted evidence that plaintiff could not perform his own job at that time, and plaintiff's supervisor testified that gardeners often had to work alone.  Requiring an employer to provide a second employee to do an employee's job is hardly a reasonable accommodation.

4.      On summary judgment, where a defendant has met its initial burden, the plaintiff must muster some evidence supporting specific facts, rather than rest on conclusory allegations.  Plaintiff's moving papers and declaration look more like a complaint attempting to state any and every possible claim than an opposition to a summary judgment motion.

5.      In FEHA discrimination cases, California courts have relied upon the standards articulated by the United States Supreme Court for proving intentional discrimination under Title VII of the federal Civil Rights Act.  See Mixon v. Fair Employment & Housing Comm'n, 192 Cal. App. 3d 1306, 1316-1319 (1987).